NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

SARAH R., *Appellant*,

*v.*

JEREMY R., C.R., *Appellees*.

No. 1 CA-JV 15-0270
FILED 2-9-2016

---

Appeal from the Superior Court in Yavapai County
No.  P1300SV201400012
The Honorable Celé Hancock, Judge

**REVERSED**

---

COUNSEL

Law Office of Florence M. Bruemmer, PC, Anthem
By Florence M. Bruemmer
*Counsel for Appellant*

Prescott Law Group, PLC, Prescott
By J. Andrew Jolley
*Counsel for Appellees*

---

## MEMORANDUM DECISION

Judge Margaret H. Downie delivered the decision of the Court, in which Presiding Judge Andrew W. Gould and Judge John C. Gemmill joined.

---

D O W N I E, Judge:

¶1          Sarah R. ("Mother") appeals an order terminating her parental rights.  For the reasons that follow, we reverse.

### FACTS AND PROCEDURAL HISTORY

¶2          Mother and Jeremy R. ("Father") are the parents of C.R., who was born in July 2010.[1]  Father obtained an order of protection against Mother in November 2010 after she threatened to kill him during an argument.[2]  The next month, the family court held a hearing regarding the order of protection and ordered that Father have temporary sole custody of C.R., with Mother having supervised access.  The court found no evidence Mother had harmed or threatened C.R. and removed the child as a protected person from the order of protection.

¶3          Between December 2010 and January 2011, Mother appeared for every scheduled visit (approximately eight) with C.R. and arrived with appropriate items.  At a February 2011 family court hearing, the court heard testimony from two individuals who supervised the visits that C.R. manifested extreme anxiety at Mother's voice and presence.  The family court ordered that Father have sole custody, with Mother having no contact, saying: "When any of the Parties can demonstrate that contact between [C.R.] and [Mother] is therapeutically recommended, contact

---

[1]     Father established paternity in separate proceedings in Yavapai County Superior Court that we refer to as the "family court" proceedings in order to distinguish between them and the severance proceedings at issue in this appeal.

[2]     Mother pled guilty to disorderly conduct/domestic violence as a result of that incident and was placed on probation, which she successfully completed.

shall resume in accordance with the therapeutic recommendations."[3] The court recommended that Mother, "in an effort to develop and encourage a meaningful and positive parental relationship," maintain participation in healthcare and counseling services, take actions to "ensure long-term mental health stability," and participate in parenting classes. At a subsequent hearing in December 2012, the family court stated that Mother's therapist should provide C.R.'s therapist, Ms. Phillips, with information "to assist in the reintroduction."

¶4 In July 2014, Father filed a petition to terminate Mother's parental rights on the grounds of abandonment and neglect under Arizona Revised Statutes ("A.R.S.") section 8-533(B)(1) and (2). The juvenile court held a two-day severance hearing in February and April of 2015.

¶5 Hearing evidence established that C.R. lived with Father and his parents ("Grandfather" and "Grandmother") in what everyone agreed was a stable environment. Mother had not seen C.R. since January 2011, when the child was six months old. Nor had Mother placed Ms. Phillips in contact with a satisfactory therapist, despite submitting multiple names and authorization forms. The juvenile court received evidence that C.R. had ongoing speech, physical, and occupational therapy issues. The child also had "issues with lots of different people," would sometimes react violently during therapy sessions at home, and had several strong "melt downs" when meeting strangers — especially men.

---

[3] Evidence from the 2015 severance hearing called into question whether Mother was the cause of C.R.'s behaviors. One of the visitation observers posited in her 2011 family court testimony that C.R. was displaying "a trauma-based response" to Mother. The other observer expressed concern about C.R.'s reaction to Mother and opined that visits "trigger emotional memories." At the 2015 hearing, however, the first observer testified that the majority of Mother's visits were positive and that C.R.'s fussiness could have been related to nap times. More importantly, she conceded she would not have offered the same opinion if she knew C.R. would continue having such extreme reactions after not seeing Mother for an extended period of time. No witness, including C.R.'s therapist, could state with any degree of certainty that C.R.'s behaviors were attributable to Mother.

¶6       The court terminated Mother's parental rights on the ground of abandonment, *see* A.R.S. § 8-533(B)(1), and did not address the additional grounds for severance Father had alleged.[4]  Mother timely appealed.  We have jurisdiction pursuant to Arizona Rule of Procedure for the Juvenile Court 103(A) and A.R.S. §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1).

**DISCUSSION**

**I.       Grounds for Termination**

¶7       To terminate parental rights, the court must find at least one statutory ground by clear and convincing evidence. A.R.S. § 8-537(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 281–82, ¶ 7 (2005).  It must also find by a preponderance of the evidence that termination is in the child's best interests.  *See* A.R.S. § 8-533(B); *Calvin B. v. Brittany B.*, 232 Ariz. 292, 296, ¶ 18 (App. 2013).  We review a termination order for an abuse of discretion and will affirm if it is supported by sufficient evidence. *Kenneth B. v. Tina B.*, 226 Ariz. 33, 36, ¶ 12 (App. 2010).  We view the evidence in the light most favorable to sustaining the superior court's ruling. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 250, ¶ 20 (2000).

**II.      Abandonment**

¶8       A.R.S. § 8-531(1) defines "abandonment" as follows:

> "Abandonment" means the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child.  Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

---

[4]      In the same line of the ruling, the court stated it was terminating Mother's parental rights based on A.R.S. § 8-533(B)(2) (neglect or willful abuse).  However, because the court did not address anything other than abandonment and specifically stated it was *not* doing so, we presume it intended to refer only to A.R.S. § 8-533(B)(1).

In its order terminating Mother's parental rights, the court stated, in pertinent part:

> Although given the opportunity to establish a therapeutic relationship with the minor child through counseling, mother did not do so. Mother also did not take advantage of the opportunities to receive information about the minor child through the paternal grandparents.
>
> Had mother taken advantage of the suggestions of the family law court, she could have then *returned* to the family law court, shown that court that she had taken advantage of their suggestions and requested modification of the court orders. Mother did nothing to assert her legal rights.
>
> . . .
>
> The Court FINDS that Mother has made minimal efforts to communicate with the child and that she has not had any contact with the child for more than six months.

¶9 Courts consider a parent's conduct, not subjective intent, in determining whether he or she "provided reasonable support, maintained regular contact, made more than minimal efforts to support and communicate with the child, and maintained a normal parental relationship." *Michael J.*, 196 Ariz. at 249–50, ¶ 18. Where circumstances prevent a parent from exercising traditional bonding methods, she "must act persistently to establish the relationship however possible and must vigorously assert [her] legal rights to the extent necessary." *Id.* at ¶ 22. This is because a parent generally carries the burden of asserting her legal rights at every opportunity. *Id.* at 251, ¶ 25. However, "[a] parent may not restrict the other parent from interacting with their child and then petition to terminate the latter's rights for abandonment." *Calvin B.*, 232 Ariz. at 297, ¶ 21. When so restricted, a parent is not necessarily expected to exhibit the same level of traditional parental conduct or to take every possible legal measure to reduce barriers to parenting. *See, e.g., id.* at ¶¶ 25–26 (reversing abandonment finding where, although father was not "a salutary parent" who diligently pursued his rights and fulfilled "his corresponding parental responsibilities," mother had erected barriers to his parenting).

¶10 Mother clearly did not maintain a normal parental relationship with C.R. for more than six months. But whether she failed to do so without just cause is far less clear. *See* A.R.S. § 8-531(1) (failure to maintain relationship must be without just cause to constitute *prima facie*

evidence of abandonment). Mother's contact with her daughter was cut off by a court order that essentially delegated authority to C.R.'s therapist to determine its duration. Severance hearing evidence established that Mother had little ability to affect visitation because Ms. Phillips testified that regardless of any action or progress by Mother, C.R. had not progressed to a point where she would recommend reintroduction to Mother. Thus, nothing demonstrated that Mother's failure to provide the correct therapist's information to Ms. Phillips had any effect on her ability to see or maintain contact with C.R.

¶11 Moreover, there was substantial evidence that Mother *did* take actions within her control to address her own issues that might otherwise prevent contact once Ms. Phillips deemed C.R. ready for reintroduction. She took multiple parenting classes, remained enrolled in healthcare and counseling services, and completed a domestic violence program. Mother contacted Ms. Phillips on numerous occasions to inquire about C.R. and attempted to provide authorization forms and therapist information. Mother also emailed Grandfather to inquire about C.R. and her welfare.[5]

---

[5]    In one email to Grandfather, Mother wrote:

I am writing you in concern of my daughter [C.R.]. I would like to know how she has been doing and what has been going on in her life. I know that she has had some appointments recently and I want to know how everything has been going with all of them. My oldest daughter [K.] and I do love her and miss her so much with all my heart and would really like to be in and part of her life, also for her to know who her mother and older sister [K.] are. . . . I would also like to know what [C.R.] does everyday and what she likes and doesn't like. Does she have any favorite things that she really enjoys or likes to do? How is she doing with her talking, has she learned any new words or sentences? How has she been doing with her eating and feeding herself? Is there a favorite thing that she likes to eat or any foods that she really doesn't like? I know that she is getting bigger and growing so fast, how much does she weigh and how tall is she now? I really do love [C.R.] and miss her so much and think about her all day everyday. Could you please give her lots of hugs and kisses and let her

**¶12**  Mother admitted she could have been more assertive in attempting to reintegrate into C.R.'s life. She gave up on sending clothing and gifts because she felt the items never reached C.R. She stopped emailing Grandfather for updates after his replies simply directed her to consult her attorney or court reports. When that avenue proved unproductive, Mother turned to Ms. Phillips for updates about C.R. She also sought alternative ways to bond with C.R. that would still comply with the family court's orders. For instance, Mother suggested one-way visitation, such that she could see her daughter without C.R. knowing she was present. She also pursued visits for C.R.'s half-sister, prepared a photo album for C.R., and suggested showing the child pictures as a means of reacquainting her with Mother and maternal relatives. And Mother testified that throughout the proceedings, she continuously tried to resolve the matter with Father.

**¶13**  Given the significant limitations imposed on Mother, and the high standard of proof required to terminate her rights, the evidence was insufficient to establish that Mother failed to maintain a normal parental relationship with C.R. without just cause.[6]

---

know that [K.] and I do love her and care about her and miss her so so much. Also could you please send me some pictures of her having fun doing what she does and likes everyday? I hope that everything goes well at her doctors appointment on Friday[.] I wish that I could be there for her. Hope that you have a very blessed and wonderful day! Thank you for your time and I look forward to hearing back from you soon on how my beautiful little girl is doing.

According to Father's termination petition, as of July 2014, Mother had emailed Grandfather "on approximately seven occasions" to inquire about C.R.

[6] Though not strictly necessary to our holding, we have other concerns about the abandonment finding, including the juvenile court's refusal to permit Mother to make a record after it excluded testimony about Father's attempts to limit Mother's email communications. The court also refused to allow evidence that Mother had paid "thousands of dollars" for legal services relating to C.R. Additionally, after Father called Mother as an adverse witness at the outset of the severance hearing, the court warned Mother's attorney: "if you . . . don't ask all of the questions

## III.     Best Interests Finding

**¶14**          Even if we were to affirm the abandonment finding, we would nevertheless reverse the severance order because there was inadequate proof that termination of Mother's parental rights was in C.R.'s best interests.  *See Kent K.*, 210 Ariz. at 284, ¶ 22 (party seeking termination must prove best interests by a preponderance of the evidence).  It is true that "in most cases, the presence of a statutory ground will have a negative effect."  *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350, ¶ 23 (App. 2013).  However, a court cannot "assume that a child will benefit from a termination simply because he has been abandoned."  *Demetrius L. v. Joshlynn F.*, ___ Ariz. ___ (2016).  The petitioning party must instead prove that the child will derive an affirmative benefit from termination or incur a detriment without it.  *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 6 (App. 2004).

**¶15**          In its best interests finding, the superior court stated that C.R. "has several medical and emotional issues and mother has made little to no effort to establish communication, continue a relationship or support the child."  But we cannot discern from the record what "affirmative benefit" C.R. will receive from terminating Mother's rights or what detriment she will incur without such an order.  Mother poses no risk to the child, as family court orders currently prohibit her from seeing C.R.  Mother testified she is willing to wait until interaction would be beneficial to C.R., and she accepts that her current role is limited.  Mother also believes C.R. is in a stable home and has no intention of disrupting it.

that you want to ask now, you may not be allowed to ask them later."  This required Mother to anticipate and defend against facts and allegations not yet presented and left counsel in a quandary over whether to cover certain issues that might or might not arise in Father's case-in-chief.  When Mother's counsel politely objected and advised that going into matters such as mental health was stressful for Mother if unnecessary, the court responded, "Honestly I don't give a crap about either one of these people."  The court went on to state that its only concern was C.R.'s best interests.  The child's best interests are obviously important, and even paramount in the second step of the severance analysis.  But when a court acts to terminate a parent's fundamental constitutional right to "the companionship, care, custody, and management of his or her children," *Stanley v. Illinois*, 405 U.S. 645, 651 (1972), it must necessarily be concerned with the parent's rights as well.

There are no adoption plans. *Cf. Oscar O.*, 209 Ariz. at 334, ¶ 6 (current adoptive plan is a well-recognized benefit).

**¶16**            Father's suggestion that severing Mother's rights would allow him to "share joint-legal decision making with the paternal grandmother" has no discernible legal basis.[7]  *Cf.* A.R.S. § 25-409(A) (delineating third party rights to legal decision-making authority and requiring, *inter alia*, proof that it would be significantly detrimental to the child to remain or be placed in the care of *either* legal parent).  Father also suggests that terminating Mother's parental rights will alleviate "stress and anxiety."  He does not explain how severance will achieve this goal or whose "stress and anxiety" will be reduced.  Father also argues, "Continuation of the parent-child relationship would be a detriment to [C.R.] because [Mother] has failed to establish and maintain a parental relationship with the child, [and] has consciously disregarded the obligations owed by a parent to a child[.]"  But this merely restates the grounds for abandonment.

**¶17**            Mother, on the other hand, testified that C.R.'s half-sister and maternal grandmother desire a relationship with C.R.  Father testified such relationships are unimportant, and he objects to visits.  The court did not find that C.R.'s best interests would be advanced by not knowing or interacting with her maternal relatives.  And C.R.'s therapist testified C.R. would suffer no harm from having a relationship with her older sister. Additionally, Mother receives disability benefits, and she testified that, as her daughter, C.R. may be entitled to Social Security benefits in the future.

**¶18**            Severance of Mother's parental rights will render C.R. an orphan on the maternal side, with no corresponding benefit apparent from the record.  *Cf. Maricopa Cty. Juv. Action No. JS-500274*, 167 Ariz. 1, 8 (1990) (despite abandonment finding, "[w]e cannot hold that there is sufficient evidence to terminate when the record is entirely devoid of any explanation of what [the child] will gain or lose").  Based on the record before us, we conclude the juvenile court's finding that terminating Mother's parental rights would be in C.R.'s best interests is not supported by substantial evidence.

---

7            When asked at the severance hearing why terminating Mother's rights was in C.R.'s best interests, Father stated that he liked "to coparent with my mom" and that he wanted "to have joint custody with my mom."

## CONCLUSION

¶19       For the foregoing reasons, we reverse the order terminating Mother's parental rights.



Ruth A. Willingham · Clerk of the Court
FILED: ama

10